PRESENT: Koontz, Kinser, Lemons, Goodwyn, and Millette, JJ.,
         and Carrico and Russell, S.JJ.

MATTHEW M. DOWDY

                                      OPINION BY
v.        Record No. 082143     JUSTICE CYNTHIA D. KINSER
                                     November 5, 2009
COMMONWEALTH OF VIRGINIA

          FROM THE COURT OF APPEALS OF VIRGINIA

     In Husske v. Commonwealth, 252 Va. 203, 476 S.E.2d 920

(1996), we held "that an indigent defendant who seeks the

appointment of an expert witness, at the Commonwealth's

expense, must demonstrate that the subject which necessitates

the assistance of the expert is 'likely to be a significant

factor in his defense,' and that he will be prejudiced by the

lack of expert assistance."  Id. at 211-12, 476 S.E.2d at 925

(internal citations omitted) (quoting Ake v. Oklahoma, 470

U.S. 68, 82-83 (1985)).  In this appeal, we decide, among

other issues, whether the Husske prejudice requirement runs

afoul of the decision in Ake and whether the trial court

abused its discretion by refusing to provide all the

investigative services requested by the defendant.  We answer

these questions in the negative and, finding no other error,

we will affirm the judgment of the Court of Appeals of

Virginia upholding the defendant's convictions.

## I.  MATERIAL FACTS AND PROCEEDINGS

Matthew M. Dowdy was indicted in the Circuit Court of Fairfax County for the rape and first-degree murder of Judy Jaimie Coate in violation of Code §§ 18.2-61 and -32, respectively.  In a pre-trial motion, Dowdy requested the appointment of an investigator to aid in building Dowdy's alibi defense and to rebut the Commonwealth's theory that the murder occurred on September 23, 2005.  At a hearing on the motion, Dowdy explained that he was with the victim on September 23 and again the next morning when, according to Dowdy, they engaged in consensual sexual intercourse.  Dowdy also asserted that he had a list of witnesses, some of whom allegedly saw him either on September 23 or 24 and could corroborate Dowdy's statements to the police regarding his activities on those two days.  Thus, according to Dowdy, he needed an investigator to interview these witnesses because if his attorney did so, the attorney would not be able to impeach such a witness at trial if the witness testified inconsistently with his or her prior statement.

Following argument by the parties, the circuit court denied Dowdy's motion seeking the appointment of an investigator.  Citing this Court's decision in Husske, the circuit court explained that Dowdy needed to demonstrate not only that the subject for which expert assistance was sought,

i.e., Dowdy's alleged alibi, would be a significant factor in his defense but also that he would be prejudiced without the services of an investigator. As to the prejudice showing, the court noted that the only justification offered for the appointment of an investigator was the inability of Dowdy's counsel, as opposed to that of an investigator, to offer impeachment testimony if witnesses testified contrary to their earlier statements. Thus, the court concluded that the appointment of an investigator was not warranted under those circumstances.[1]

More than nine months later, Dowdy moved for reconsideration of the circuit court's denial of his request for the appointment of an investigator. Dowdy claimed that he needed an investigator to inspect the crime scene, pursue information about alternate suspects, and locate individuals who could corroborate Dowdy's alibi and provide evidence about the relationship between Coate and Dowdy. Further, Dowdy argued that the discovery of personal effects purportedly belonging to an individual named Billy Gacheru near the crime scene now made appointment of an investigator crucial, as necessary to finding Gacheru. Dowdy also argued, as before, that an investigator was needed to avoid a possible conflict

---

[1] In his pre-trial motion, Dowdy also requested the appointment of a forensic pathologist. The circuit court granted that request.

for his counsel if witnesses' testimony differed from statements given to his counsel.

Both orally before the circuit court and in a memorandum, Dowdy raised the claim that denial of investigative services, which are made available to persons represented by the public defender, deprived him of due process and equal protection of the law, as required by the Fifth and Fourteenth Amendments.[2] In his memorandum, Dowdy also argued that requiring an "advance showing of prejudice" under Husske violated his due process rights and contravened the decision of the United States Supreme Court in Ake, and further that denial of an investigator violated his Sixth Amendment right to the effective assistance of counsel and was not in accord with Code § 19.2-163.[3]

The circuit court rejected Dowdy's argument that he needed an investigator to offer impeachment evidence if witnesses testified contrary to their prior statements, noting that use of a signed statement from each potential witness would resolve the dilemma posed by Dowdy. Dowdy agreed with the court's observation. The circuit court, however, granted

---

[2] Apparently, the public defender could not represent Dowdy because of a conflict of interest.

[3] Dowdy also raised these latter arguments in a memorandum in support of his original motion for the appointment of an investigator.

the motion for the appointment of an investigator for the limited purpose of locating Billy Gacheru and directed that the investigator perform solely that task.

At trial, the evidence showed that Coate's body was discovered on September 27, 2005 behind a large, metal telephone utility box located near Lee Highway in Fairfax County. Dowdy admitted that he had been in that location previously to drink, as recently as the Tuesday before Coate was killed. A trail of bloody footprints leaving the crime scene continued for approximately 275 feet towards the City of Falls Church, where Dowdy was then residing in a motel room, before becoming too faint to trace.[4]

Coate had been stabbed repeatedly and had sustained, among other injuries, an incise wound to her neck, fractured ribs, two fractures of her jaw, and multiple abrasions and bruises. The medical examiner who performed an autopsy on Coate's body opined that the cause of death was the "incise wound of [the] neck with contributing multiple stab wounds and blunt force injuries." Based on the nature of the stabbing and cutting wounds, he also opined that a knife had been used to inflict them.[5] The medical examiner, however, could not

---

[4] A crime scene police investigator testified that the footprints were left by an "athletic shoe." Dowdy admitted that he was wearing tennis shoes on September 23.

[5] The murder weapon was not recovered.

5

pinpoint the time of death because of the body's decomposed condition.

A friend of Coate's, Stephanie Schelhorn, testified that she spoke by telephone with the victim around noon on September 23 regarding their plans to go out of town during the upcoming weekend. Schelhorn was unable to make further contact with the victim. Coate's supervisor at her place of employment, a temporary staffing agency located adjacent to Lee Highway, saw Coate sometime between 3 p.m. and 6 p.m. on September 23 when she came in from a job assignment to collect her pay. A blood-soaked paycheck from Coate's employer was found in her pants pocket at the crime scene, but the condition of the check made its date illegible.

Dowdy admitted seeing the victim twice on September 23. The first encounter occurred between 1:30 p.m. and 2:45 p.m. at the staffing agency's office, where Dowdy also worked. Dowdy left the office but returned at approximately 6:00 p.m., hoping to get a job assignment for the evening. Learning that no jobs were available, Dowdy went to an adjacent convenience store where he saw Coate. Coate agreed to accompany Dowdy to a nearby plaza. Dowdy and Coate subsequently proceeded on foot to a liquor store, by way of a townhouse where one of Dowdy's friends resided, arriving at the liquor store between 6:25 p.m. and 6:45 p.m. Dowdy purchased a bottle of liquor

while Coate waited outside.[6]  According to Dowdy, he and Coate walked together a short distance from the liquor store and then parted company, with Coate heading toward a beauty salon along a route that would take her within one hundred and thirty yards of the location where her body was later discovered.[7]

Dowdy testified that he walked a short distance, in the opposite direction as Coate, to a bus stop where he waited approximately 15 minutes for a bus that transferred him to another bus stop.  He eventually rode a bus to a soccer field, arriving at approximately 8:00 p.m.  Dowdy claimed that he met several friends there but then left only a few minutes later.  According to Dowdy, he spent the remainder of the night, from approximately 8:20 p.m. until 12:30 a.m., with friends walking around and drinking at various locations, returning to his motel room at 1:30 a.m.

The next morning, September 24, Dowdy returned to his employer's office around 6:25 a.m. to find work, but when he

---

[6] When the police initially interrogated Dowdy after Coate's body was discovered, he did not tell them about walking with the victim to the liquor store.  He later admitted doing so when confronted with pictures obtained from a video surveillance camera at the liquor store.  The pictures showed Coate and Dowdy together at the liquor store.

[7] Dowdy's motel room was a "couple miles" from the place where Dowdy testified that he left the victim on the evening of September 23.

discovered that no one was on duty, he walked behind the adjacent convenience store and gas station, where he encountered Coate. Dowdy stated that Coate was drinking, visibly upset, and conversing with a man whose name Dowdy did not know. According to Dowdy, the man left shortly after Dowdy arrived, at which point Coate began to cry and threw her arms around Dowdy. Dowdy testified that he and Coate then engaged in consensual sexual intercourse in a grassy area only partially visible from the adjacent street.[8]

Dowdy testified on direct examination that he and Coate parted company in front of the convenience store at approximately 11:15 a.m., but on cross-examination Dowdy stated that he left her at the front of their employer's office at approximately 6:55 a.m. Dowdy claimed that he spent the remainder of the day at a friend's house, his motel room, and his employer's office. Dowdy stated that he never saw Coate again and maintained he had no part in her rape and murder.

Several items of physical evidence were recovered at the crime scene and during the autopsy. The evidence included vaginal swabs taken from the victim that revealed spermatozoa. A forensic scientist generated a DNA profile from those swabs

---

[8] When questioned by the police, Dowdy initially denied having sexual intercourse with the victim.

and when that profile was compared with the DNA profile generated from buccal swabs taken from Dowdy, the results could not eliminate Dowdy as a contributor of the DNA developed from the vaginal swabs—the DNA profiles matched. The forensic scientist testified that the "probability of randomly selecting an unrelated individual with a DNA profile matching the foreign DNA profile developed from the vaginal sample . . . is one in greater than 6.5 billion[,] which is approximately the world population in the Caucasian, Black, and Hispanic populations."  Forensic testing of a pair of underwear found three to four feet from Coate's head at the crime scene revealed the presence of Dowdy's DNA in "the underwear sperm fraction."  Dowdy, however, was eliminated as a contributor to a DNA profile developed from the crotch of the underwear.  That profile was consistent with a mixture "of two individuals' genetic material."

Police investigators also lifted latent hand and finger prints from the doors of the electrical utility box, and obtained hand and finger prints from Coate during the autopsy, and hand and finger prints from Dowdy.  William J. Reeves, who was employed by the Fairfax County Police Department and qualified at trial as an expert in the field of fingerprint analysis, concluded that a bloody palm print and fingerprints lifted from the utility box matched Dowdy's known prints.

9

Reeves testified that he reached this conclusion upon finding 30 points of agreement [corresponding features of ridge detail created by the impression of a hand or finger] between the prints taken from Dowdy and those lifted from the utility box. Reeves opined that the prints on the utility box door could not have been there before the blood was deposited on it. Another crime scene investigator who also qualified as an expert in the field of fingerprint identification agreed: "the handprints that are on that door in blood are there from a transfer of a wet hand onto a dry surface."

During cross-examination, Reeves testified that he was "a hundred percent certain that Mr. Dowdy left the prints," and on both cross-examination and redirect stated that any inconsistency in the number of points he identified at Dowdy's preliminary hearing was attributable to confusion as to the area of the print about which he was being questioned. Reeves admitted that during his approximately 28 years working in the field of fingerprint identification prior to his employment with the Fairfax County Police Department, he had worked with known prints, not latent prints.[9] Reeves testified, however,

---

[9] Known prints, also called "ink prints," are taken from an identified subject by "the recording of the tips of the fingers from the first joint to the tip of the finger onto generally a white card using . . . black printers ink." Latent prints are "hidden or undeveloped, and must be

that since joining the Fairfax County Police Department over five years ago, his work as a fingerprint examiner has involved comparing known prints with latent prints "every day of the week," specifically affirming that he engages in "continuous comparison of fragmentary impressions, observations of peculiarities and variations and thoughtful consideration" of latent prints.  Reeves admitted, however, that he had not taken a proficiency test for several years, although the Scientific Working Group on Friction Ridge Analysis, Study and Technology ("SWGFAST") guidelines, which he recognized as authoritative, directed that such a test be completed annually.

Reeves was also asked during cross-examination whether he was aware of and/or followed the Fairfax County Police Department guidelines for latent fingerprint examination, and whether he took steps to guard against expectation bias—when observations may be skewed toward what the observer expects to see.  Reeves testified that he was not aware of and did not follow any Fairfax County guidelines, but nevertheless did comply with the generally accepted practices for latent fingerprint evaluation, did not deviate from those practices, or take any shortcuts.  Acknowledging the danger of

developed or [made] visible through some means of either powdering or some type of chemical development."

11

expectation bias, Reeves stated that he nevertheless examined the latent prints lifted from the utility box door knowing Dowdy was the main suspect.

With regard to his evaluation process and timeline, Reeves testified that he was unsure of the exact dates on which he performed the evaluation of the latent prints. Reeves was uncertain as to which known prints, Coate's or Dowdy's, he first compared with the latent prints recovered from the utility box door, and he used only Coate's known prints as "elimination prints."[10]  Reeves also stated that he did not prepare a contemporaneous report of his conclusions or make contemporaneous notes, instead finishing his standard, one-page report about a month after completing his evaluation of the prints.  While the report provided no basis for his conclusion that Dowdy's known prints matched the latent prints, it did, however, state that there were no latent prints of identification value that remained unidentified. Finally, Reeves testified that he turns over his work to other fingerprint examiners to have them "independently check [and] verify" the accuracy of his conclusions and that he does not "make an identification if there is a doubt about" whether two prints came from the same subject.

_____

[10] Elimination prints are those taken from persons who were known to be at the place in question for legitimate reasons.

At the conclusion of Reeves' testimony, Dowdy moved to strike the testimony on the grounds that Reeves' method of identifying the latent prints as Dowdy's was not scientifically reliable because Reeves deviated from the SWGFAST guidelines, performed no validity testing, had no method for calculating an error, had no scientific basis for the number of points he used, did not do proficiency testing, made no notes, and utilized only one set of elimination prints. The circuit court overruled the motion, concluding that the concerns raised went to the credibility of Reeves' testimony, which was for the jury to decide. The court concluded that Reeves' opinion was not "inherently incredible" and that his training and experience rendered his testimony admissible.[11]

The jury returned a verdict of guilty on both charges. Dowdy was sentenced to life imprisonment on the first-degree murder conviction and 30 years imprisonment on the rape conviction, to run consecutively.

In a per curiam order, the Court of Appeals of Virginia refused Dowdy's appeal.[12] Dowdy v. Commonwealth, Record No.

---

[11] The circuit court also denied Dowdy's motion to strike the evidence as to both charges.

[12] A three-judge panel of the Court of Appeals subsequently refused Dowdy's appeal and affirmed his convictions for the reasons previously stated in its per

2204-07-4, slip op. at 7 (May 30, 2008).  As to Dowdy's challenge to the circuit court's refusal to appoint an investigator to find persons who allegedly saw Dowdy the night of September 23, the Court of Appeals concluded that these potential witnesses, if found by an investigator, could not buttress Dowdy's alibi because he had admitted being alone with Coate not far from the crime scene the morning of September 24.  Id.  The Court of Appeals also rejected Dowdy's claim that he needed to find and interview individuals who allegedly saw Dowdy later in the day on September 24.  Id.

The Court of Appeals further applied Rule 5A:18 to bar review of Dowdy's argument that requiring a showing of prejudice under Husske contravened the decision in Ake, Dowdy's assertion that his equal protection rights were violated because he would have had the services of an investigator if he had been represented by the public defender, and his claim that the provisions of Code §§ 19.2-163 and -332 required the appointment of an investigator.  Id., slip op. at 8-10.  Although Dowdy raised these arguments in memoranda before the circuit court, the Court of Appeals concluded that the arguments were waived because Dowdy did not make the particular arguments during the hearings in the

---

curiam order.  Dowdy v. Commonwealth, Record No. 2204-07-4, slip op. at 1 (Oct. 2, 2008).

14

circuit court and the court did not specifically rule on them.
Id.  The Court of Appeals also held that Dowdy's claim
asserting that the circuit court's refusal to appoint an
investigator denied him the effective assistance of counsel
could not be raised on direct appeal.[13]  Id., slip op. at 10.

The Court of Appeals, however, did reach Dowdy's final
contention that the circuit court erred by refusing to strike
the fingerprint expert's testimony as scientifically
unreliable.  Finding that the circuit court did not abuse its
discretion in failing to strike Reeves' testimony, the Court
of Appeals observed that fingerprint analysis, which was the
scientific method offered, required no foundation of
reliability because it is "'so familiar and accepted.'"  Id.,
slip op. at 12-13 (quoting Spencer v. Commonwealth, 240 Va.
78, 97, 393 S.E.2d 609, 621 (1990) (emphasis omitted)).  As to
the reliability of Reeves' analysis of the latent prints found
at the crime scene, the Court of Appeals concluded that his
testimony, in which Reeves indicated that he "followed the
generally accepted practices of the latent fingerprint
community" and obtained independent verification of his

_____

[13] The Court of Appeals in its per curiam order also held
that Dowdy, by agreeing with the circuit court's suggestion
that he obtain signed statements from all potential witnesses
interviewed to avoid the purported advocate-witness conflict
for his counsel, had waived any claim of error as to that
particular ruling.  Dowdy, slip op. at 7-8.

15

findings by another fingerprint examiner, provided "a sufficient foundation to warrant admission of the testimony." Id., slip op. at 13.

Now on appeal to this Court, Dowdy raises multiple assignments of error that can, however, be grouped into three categories: (1) procedural issues concerning the Court of Appeals' application of Rule 5A:18 and Dowdy's ineffective assistance of counsel claim; (2) failure to appoint an investigator and related questions concerning the Husske prejudice requirement, equal protection, and a statutory claim to investigative services; and (3) admission of the testimony of Reeves, the Commonwealth's fingerprint analyst. We will address the issues in that order.

II.  DISCUSSION

A.  Procedural Issues

Dowdy challenges the holding of the Court of Appeals that, under Rule 5A:18, he waived the following arguments: the showing of prejudice articulated in Husske imposed a burden on him that is not in accord with the decision in Ake and therefore violated his right to due process; the circuit court violated his right to equal protection because he would have received the services of an investigator if he had been represented by the public defender; and Code §§ 19.2-163 and –332 required the appointment of an investigator.  We conclude

16

that the Court of Appeals erred in its application of Rule 5A:18.  As we recited in section one of this opinion, Dowdy raised each of the foregoing arguments either at the hearing when he requested the circuit court to reconsider its refusal to appoint an investigator or in memoranda that were before the circuit court at the time of its initial decision on his request or later on reconsideration of its ruling.  At both hearings on this issue, the circuit court expressly indicated that it had read Dowdy's pleadings, and refused the relief requested.  Thus, Dowdy did not waive these particular arguments, and they are now properly before this Court.[14]  See Rule 5:25.

---

[14] When Dowdy filed his petition for appeal, he presented ten assignments of error, and this Court granted an appeal on all the assignments of error.  Dowdy v. Commonwealth, Record No. 082143 (Apr. 8, 2009).  In his opening brief filed pursuant to Rules 5:27 and 5:17(c), he omitted four of the assignments of error in the heading titled "Assignments of Error."  Three of the omitted assignments of error challenge the circuit court's substantive rulings on whether the Husske prejudice requirement contravenes the decision in Ake, whether Dowdy's equal protection rights were violated, and whether he has a statutory right to appointment of an investigator. Those three omitted assignments of error are thus waived.  See Rules 5:27 and 5:17(c); White v. Commonwealth, 267 Va. 96, 102-03, 591 S.E.2d 662, 665-66 (2004) (holding that the Court will not consider assignments of error as modified by appellant's opening brief, but only as granted by the Court). We can, however, reach the underlying issues raised in those omitted assignments of error because Dowdy's first assignment of error encompasses the same issues and because Dowdy briefed those issues.

The fourth omitted assignment of error challenges the circuit court's conclusion that refusing to appoint an

17

The Court of Appeals, however, did not err in holding that Dowdy's ineffective assistance of counsel claim based on the denial of investigative services may not be heard on direct appeal.  Johnson v. Commonwealth, 259 Va. 654, 675, 529 S.E.2d 769, 781 (2000).  Insofar as Dowdy now argues that the circuit court's refusal to appoint an investigator violated his right to counsel under the Sixth Amendment, we hold that Dowdy defaulted that claim by arguing in the circuit court only that it denied him effective assistance of counsel.  See Rule 5:25.

B.  Appointment of Investigator

In challenging the circuit court's refusal to appoint an investigator, Dowdy not only asserts that he made the

---

investigator did not amount to ineffective assistance of counsel.  This challenge to the circuit court's decision is likewise waived, but we nevertheless reach the remaining assignment of error challenging the Court of Appeals' holding that Dowdy could not raise his ineffective assistance of counsel claim on direct appeal.

We also note that, in Dowdy's opening brief, he reworded his first assignment of error challenging the circuit court's refusal to appoint an investigator.  While it is improper for an appellant to alter the wording of an assignment of error from that stated in the petition for appeal, non-substantive changes to an assignment of error, like those in Dowdy's first assignment of error, do not default the issue raised. Allstate Ins. Co. v. Gauthier, 273 Va. 416, 418 n.*, 641 S.E.2d 101, 103 n.* (2007).  See Hudson v. Pillow, 261 Va. 296, 301-02, 541 S.E.2d 556, 560 (2001) (holding that the Court could review a modified assignment of error because the modification did not allow the appellant to argue "a different question on appeal or an issue not presented to the [trial court]").

18

requisite showing of particularized need but also claims that the Husske prejudice requirement is not in accord with Ake and violated his due process rights, that his equal protection rights were violated, and that Code §§ 19.2-163 and -332 required the appointment of an investigator.  We will address each claim separately, starting with the prejudice issue.

### 1.  Husske Prejudice

In Ake v. Oklahoma, the Supreme Court of the United States decided "whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense."  470 U.S. at 77.  The Court identified three factors that were relevant to the determination:

> the private interest that will be affected by the action of the State[;] the governmental interest that will be affected if the safeguard is to be provided[; and] the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

Id.

Weighing the nature of the private interest at stake with the probable value that appointment of the expert would add against the burden on the State, the Court concluded that "when the State has made the defendant's mental condition

19

relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." Id. at 80.  The Court thus held "that when [an indigent] defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense."  Id. at 83.  According to the Court, "[i]t is in such cases that a defense may be devastated by the absence of a psychiatric examination and testimony; with such assistance, the defendant might have a reasonable chance of success."  Id.  In contrast, the Court in Caldwell v. Mississippi, 472 U.S. 320 (1985), decided a few months after Ake, concluded that a significant factor was not shown when a defendant offered "little more than undeveloped assertions that the requested assistance would be beneficial." Id. at 323 n.1.

    While Ake involved the appointment of a psychiatric expert, we observed in Husske that courts have held "that the Due Process and Equal Protection clauses require the appointment of non-psychiatric experts to indigent defendants" where "the defendants ma[k]e a particularized showing of the

20

need for the assistance of such experts." 252 Va. at 211, 476 S.E.2d at 925. We viewed the Ake and Caldwell decisions as requiring the Commonwealth to provide indigent defendants with these "'basic tools of an adequate defense,'" when properly requested, but not "all assistance that a non-indigent defendant may purchase." Husske, 252 Va. at 211, 476 S.E.2d at 925 (quoting Ake, 470 U.S. at 77).

We thus held "that an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is 'likely to be a significant factor in his defense,' and that he will be prejudiced by the lack of expert assistance." Id. at 211-12, 476 S.E.2d at 925 (internal citations omitted) (quoting Ake, 470 U.S. at 82-83). We further stated that an indigent defendant satisfies this test by showing that "the services of an expert would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial." Id. at 212, 476 S.E.2d at 925. Dowdy contends that Husske's requirement of prejudice imposed a burden on him beyond that required by Ake and thus violated his due process rights. We do not agree.

Essential to our holding in Husske was the determination that an indigent defendant's private interest in an accurate

21

and fair criminal proceeding may outweigh the Commonwealth's interest in economy when the "probable value of the additional . . . safeguards that are sought," and "the risk of error in the proceeding" if those safeguards are not provided are significant. Ake, 470 U.S. at 77-79. As the Court recognized in Ake, "[i]t is in such cases that a defense may be devastated by the absence of" the expert assistance. 470 U.S. at 83 (emphasis added). Or, as we stated in Husske, that the defense will be prejudiced by the lack of the requested expert assistance. 252 Va. at 212, 476 S.E.2d at 925. Thus, when an indigent defendant has demonstrated that the subject that requires expert assistance is "likely to be a significant factor in his defense," id., Husske's prejudice requirement merely directs a trial court to determine, based on the facts of the particular case, the probable value of providing the requested assistance and the risk of error in the criminal proceeding if such is not provided. See State v. Campbell, 498 A.2d 330, 332-33 (N.H. 1985) ("The analyses of probable value and risk must necessarily focus on the relationship between the subject of the expert services and the issues in the case.").

Other jurisdictions have adopted a similar construction of Ake. See, e.g., Ford v. Seabold, 841 F.2d 677, 690-91 (6th Cir. 1988) (holding that denial of expert assistance did not

22

violate due process where "the risk of an erroneous deprivation of . . . liberty [] is . . . slight"); <u>Little v. Armontrout</u>, 835 F.2d 1240, 1243-44 (8th Cir. 1987) (holding that the defendant must "show a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial"); <u>Moore v. Kemp</u>, 809 F.2d 702, 709-10, 712 (11th Cir. 1987) (affirming denial of a request for expert assistance because the defendant had failed to show that, unless the expert was provided, he "would likely be denied an adequate opportunity fairly to . . . present his defense"); <u>Chao v. State</u>, 780 A.2d 1060, 1069-70 (Del. 2001) (affirming the trial court's refusal of expert assistance when the expert's absence would not "significantly prejudice the defense or increase the risk that the jury would convict . . . erroneously"); <u>Thorson v. State</u>, 895 So. 2d 85, 122-23 (Miss. 2004) (holding that state-funded expert assistance must be afforded only when the court finds that "a defendant is prejudiced by the denial of expert assistance to the extent that he or she is denied a fair trial"); <u>Alverson v. State</u>, 983 P.2d 498, 511 n.34 (Okla. Crim. App. 1999) (noting that the defendant "must make a showing of need and show that he will be prejudiced by the lack of expert assistance"); <u>State v. Scott</u>, 33 S.W.3d 746, 752-53 (Tenn. 2000) (holding that state-funded expert assistance is mandated

only where the defendant shows "'that a substantial need exists <u>requiring</u> the assistance . . . and that his defense cannot be fully developed without such professional assistance' ") (citation omitted).

We conclude that <u>Husske</u>'s requirement of prejudice is faithful to <u>Ake</u> and is nothing more than another way of asking whether the denial of expert assistance would result in a fundamentally unfair trial, thereby bringing into question the accuracy of the criminal proceeding. See <u>Moore</u>, 809 F.2d at 712 ("[A] defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial."); <u>accord</u> <u>Page v. Lee</u>, 337 F.3d 411, 416 (4th Cir. 2003). Thus, the circuit court did not violate Dowdy's due process rights when it analyzed his request for appointment of an investigator using the criteria articulated in <u>Husske</u>: whether Dowdy's alleged alibi was likely to be a significant factor in his defense and whether he would be prejudiced by the denial of additional investigative services.

## 2. Denial of Investigator

Dowdy argues the circuit court erred when it refused to appoint an investigator to assist in locating and interviewing a "host of people" who allegedly saw Dowdy on the evening of September 23 and the next morning, and could have corroborated Dowdy's alibi.[15]  Dowdy claims he satisfied the Husske and Ake requirements by showing that the subject necessitating expert assistance, his alibi, would be a significant factor in his defense and that he would be prejudiced without investigative services.  We do not agree.

As we have already stated, an indigent defendant requesting expert assistance has the burden to make "a particularized showing of the need" for such assistance. Husske, 252 Va. at 211, 476 S.E.2d at 925.  Whether an indigent defendant makes that showing is determined on a case-by-case basis, and the determination is a matter resting within a trial court's discretion.  Green v. Commonwealth, 266 Va. 81, 92, 580 S.E.2d 834, 841 (2003); Barnabei v. Commonwealth, 252 Va. 161, 171, 477 S.E.2d 270, 276 (1996).  When deciding whether an indigent defendant has shown a particularized need, the trial court must consider all the

_____

[15] We find no merit in the Commonwealth's assertion that Dowdy waived this issue when he did not object to the circuit court's decision to provide him with investigative services for the limited purpose of locating and interviewing Billy Gacheru.

facts and circumstances known at the time of the request for expert assistance. See Page, 337 F.3d at 415-16; Moore, 809 F.2d at 710, 713, 716. On appellate review, the inquiry is whether the trial court, at the time it heard the defendant's reasons for needing expert assistance, abused its discretion in concluding that the defendant did not demonstrate the requested expert would materially assist in his defense and the lack of expert assistance would result in a fundamentally unfair trial. See Husske, 252 Va. at 212, 476 S.E.2d at 925; see also Page, 337 F.3d at 416.

To demonstrate a particularized need, an indigent defendant must offer more than a "'[m]ere hope or suspicion that favorable evidence is available.'" Husske, 252 Va. at 212, 476 S.E.2d at 925 (citation omitted); see also Commonwealth v. Sanchez, 268 Va. 161, 166, 597 S.E.2d 197, 200 (2004) ("[C]onclusory assertions" that expert testimony regarding scientific testing may show the presence of errors that "'could have had a significant impact'" were not "'particularized' because they indicate[d] nothing more than [the defendant's] 'hope or suspicion.'"). For example, in Husske, we held the defendant's explanation as to why he needed a DNA expert, i.e., because DNA evidence is technical, an attorney cannot challenge such evidence without expert assistance, and the Division of Forensic Science no longer

conducts paternity testing in criminal cases, insufficient to demonstrate a "particularized need." 252 Va. at 213, 476 S.E.2d at 926. We have also concluded that a defendant's assertions that he had no available investigative resources and defense counsel lacked the time or special training to perform criminal investigative services did not show a particularized need for the appointment of an investigator. Green, 266 Va. at 91-92, 580 S.E.2d at 840-41; Bailey v. Commonwealth, 259 Va. 723, 737, 738, 529 S.E.2d 570, 578 (2000).

Likewise, Dowdy did not show a particularized need for additional investigative services as he did not demonstrate that the services "would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial." Husske, 252 Va. at 212, 476 S.E.2d at 925. His stated reasons for needing an investigator fell short of the required showing when viewed in light of the facts and circumstances made known to the circuit court at the time of the request.

Dowdy's only defense was that of alibi: one that is "based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." Black's Law Dictionary 84 (9th ed. 2009); see also Cooper v. Commonwealth, 277 Va. 377,

27

384, 673 S.E.2d 185, 189 (2009) (same). Dowdy's own representations to the circuit court in his request for an investigator demonstrate that defense's lack of viability.

Dowdy admitted to the circuit court in his multiple requests that he was alone with Coate on Friday, September 23, 2005, the last day anyone other than Dowdy claimed to have seen Coate alive. Dowdy also admitted that he had consensual intercourse with Coate on the morning of September 24. Tellingly, Dowdy did not allege that there were witnesses who could confirm his activities with Coate, or that Coate was alive after Dowdy and she parted company on September 24. Instead, Dowdy described the witnesses to be found as persons "who saw Mr. Dowdy on September 23" and September 24 that could, "for as much time as possible," "corroborate his whereabouts and . . . his alibi," "testify concerning his demeanor and appearance," and bolster Dowdy's credibility. An investigator was also sought to find and interview individuals "whose names and addresses [he did] have," investigate "information discovered there at the . . . crime scene," and "determine . . . the nature and extent of [Dowdy and Coate's] friendship." Thus, the evidence that the requested investigator would supposedly have uncovered would not have established that Dowdy lacked the opportunity to commit the rape and murder.

Dowdy's other arguments for why he needed an investigator, to find witnesses to establish the nature of Dowdy and Coate's relationship as well as his demeanor and appearance on September 23 and 24, were not buttressed with any representations regarding what further investigation on either subject would reveal, despite having personal knowledge of both. As for his assertion that he needed an investigator to inspect the crime scene and pursue information about alternate suspects, Dowdy received investigative assistance to explore the specific lead he identified, Billy Gacheru. Dowdy offered only generalized assertions to justify further assistance in these areas, even though he had received information from the Commonwealth, and had been provided a fingerprint examiner, a forensic pathologist, and a DNA expert. And, Dowdy's request for an investigator to interview witnesses because his counsel did not have the expertise or time does not show a particularized need. See Green, 266 Va. at 91-92, 580 S.E.2d at 840-41.

Dowdy's testimony at trial further demonstrates that he lacked a particularized need for additional investigative services. Dowdy mentioned various persons who saw him on September 23, but did not indicate that any of them could testify to his whereabouts from, at the latest, 6:45 p.m. on September 23, when Dowdy admitted he and Coate were together

29

and, at the earliest, 8:00 p.m., when Dowdy allegedly met friends at a soccer field. Although Dowdy claimed that Coate was with another person when he first saw her on the morning of September 24, he did not allege there were any witnesses who could confirm that Coate was alive on September 24 after his allegedly consensual encounter with her, but only mentioned persons that could corroborate his whereabouts for the remainder of the day. In sum, Dowdy's testimony at trial confirms that even if all these purported alibi witnesses for both September 23 and 24 had been located and testified at trial, they would not have corroborated Dowdy's alleged alibi. See Cooper, 277 Va. at 385-86, 673 S.E.2d at 190 (alibi instruction to be given only "when there is 'evidence that the accused was elsewhere than at the scene of the crime at the exact time or for the entire period during which it was or could have been committed'") (citation omitted).

Thus, we hold that the circuit court did not abuse its discretion in refusing to provide Dowdy with additional investigative services, as Dowdy's representations to the

court as to why an investigator was necessary fell short of showing a particularized need.[16]

### 3. Equal Protection Challenge

Dowdy alleges that, but for a conflict of interest, he would have been represented by the public defender's office and would have had available to him the services of that office's investigator.  See Code § 19.2-163.01(A)(10) (granting the Virginia Indigent Defense Commission the power to authorize "the public defender . . . to employ such . . . investigative personnel, as may be necessary to carry out the duties imposed upon the public defender office").  Thus, according to Dowdy, the circuit court's denial of an investigator violated his right to equal protection of the laws.  In support of this argument, Dowdy cites Mason v. Arizona, 504 F.2d 1345 (9th Cir. 1974) and Green v. State, 620 So.2d 188 (Fla. 1993), and contends that if a defendant proves that but for some arbitrary reason, such as the conflict in this case, he would have been represented by a public defender and that the public defender would have "actually used" the

---

[16] Dowdy also argued before the circuit court that he needed an investigator because his counsel could not offer impeachment evidence at trial if a witness testified contrary to a prior statement.  However, Dowdy agreed with the circuit court's suggestion that the use of signed statements would resolve that potential dilemma, and failed to assign error to the Court of Appeals' holding that he waived this argument. See Rule 5:17(c).  Thus, the argument is not before the Court.

available investigative resources, the denial of substantially equivalent resources is a violation of equal protection.

Without deciding whether Dowdy stated an equal protection claim or what test would govern the disposition of such a claim, we conclude that Dowdy's argument fails.  Under his own construct, he made no showing that, if he had been represented by the public defender, that office would have "actually used" available investigative resources for the purposes Dowdy requested appointment of an investigator.  Having failed to make that showing, there can be no violation of equal protection.

Thus, Dowdy is in the same position as other indigent defendants requesting expert assistance.  Whether a request for appointment of expert assistance is based on the Due Process or Equal Protection clause, the test is whether an indigent defendant has made a particularized showing of need for the expert assistance.  See Husske, 252 Va. at 211, 476 S.E.2d at 925 (courts have applied the same analysis to a defendant's equal protection and due process claims to appointment of an expert).  As we have already stated, Dowdy did not establish a particularized need for additional investigative services.

4.  Statutory Claim

Dowdy alleges that denial of an investigator contravened the provisions of Code §§ 19.2-163 and -332 by requiring appointed counsel to perform investigative services without compensation.  According to Dowdy, the "low" amount of compensation allowed court-appointed counsel for representing indigent defendants under Code § 19.2-163 and the provision for payment of other reasonable expenses pursuant to Code § 19.2-332 means that the Commonwealth must pay for investigative assistance instead of placing that burden on court-appointed counsel.  Dowdy, in essence, urges us to find a right to a court-appointed investigator whenever leaving the investigation to counsel could result in counsel not being fully compensated for time expended.  We find no merit in Dowdy's argument.

The provisions of Code § 19.2-163 provide generally for the compensation of court-appointed counsel according to a fee schedule, and for a waiver of statutory limits in certain circumstances.[17]  The statute also states: "The circuit or district court shall direct the payment of such reasonable expenses incurred by such court-appointed counsel as it deems

_____

[17] The version of Code § 19.2-163 in force at the time of Dowdy's trial lacked the fee cap waiver provisions set forth in the current version of this statute.  See 2007 Acts chs. 938, 946.  The change does not affect our analysis.

appropriate under the circumstances of the case."  Code
§ 19.2-163.  The relevant portion of Code § 19.2-332 provides:
"Whenever in a criminal case an officer or other person
renders any service required by law for which no specific
compensation is provided, or whenever any other service has
been rendered pursuant to the request or prior approval of the
court, the court shall allow therefor such sum as it deems
reasonable."

Both of these statutes merely authorize a trial court to
exercise its discretion in awarding reasonable expenses
incurred by counsel appointed to represent indigent
defendants.  Neither statute mandates the appointment of
experts to assist indigent defendants, nor their counsel.
Thus, there could be no abuse of discretion for failing to use
these statutes to provide additional investigative services to
Dowdy.

C.  Admissibility of Fingerprint Testimony

Dowdy assigns error to the circuit court's refusal to
strike Reeves' testimony.  Dowdy claims Reeves' opinion, that
the prints recovered from the crime scene matched prints taken
from Dowdy, was not reliable because Reeves did not follow the
generally accepted practices and procedures for examining and
identifying latent prints.  In particular, Dowdy points to the
following as examples of Reeves' flawed methodology: not

knowing of, and not following, Fairfax County Police Department standard operating procedures for fingerprint examination; not comparing the latent prints with any elimination prints (except the victim's); not documenting his fingerprint evaluation process and failing to draft a contemporaneous report; failing to state in his report the "points or characteristics" used in his evaluation, thus making it impossible to determine if he followed the standard methodology of "Analysis, Comparison, Evaluation, Validation"; and not having taken a competency examination in several years, though required annually by the SWGFAST guidelines.

Dowdy also cites Reeves' failure to calculate an error rate with regard to his fingerprint identification, and the lack of a scientific basis for the number of points he used to make the identification. Finally, Dowdy argues that the circuit court improperly placed the burden of proving the testimony's unreliability on Dowdy, rather than properly placing the burden to prove reliability on the Commonwealth, and also used an incorrect legal standard for the admission of expert testimony when the court admitted the testimony on the finding that Reeves' opinion was not "inherently incredible."

The "admission of expert testimony is in the sound discretion of the trial court." Payne v. Commonwealth, 277 Va. 531, 542, 674 S.E.2d 835, 841 (2009) (citation omitted);

see John v. Im, 263 Va. 315, 319-20, 559 S.E.2d 694, 696-97 (2002) (evaluating the trial court's finding of an adequate foundation to admit expert testimony under an abuse of discretion standard). "Expert testimony is admissible when it concerns matters not within the ordinary knowledge of the jury" such that it may assist the jury's understanding of the evidence presented. Payne, 277 Va. at 542, 674 S.E.2d at 841; Compton v. Commonwealth, 219 Va. 716, 726, 250 S.E.2d 749, 755-56 (1979).

"When scientific evidence is offered, the court must make a threshold finding of fact with respect to the reliability of the scientific method offered, unless it is of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system, such as fingerprint analysis." Spencer, 240 Va. at 97, 393 S.E.2d at 621 (citing Avent v. Commonwealth, 209 Va. 474, 478, 164 S.E.2d 655, 658 (1968) ("'The accuracy of fingerprint identification is a matter of common knowledge and no case has been cited, and we have found none, where identification so established has been rejected.'")); accord Billips v. Commonwealth, 274 Va. 805, 808-09, 652 S.E.2d 99, 101 (2007). When the scientific method has been found reliable, either by its familiarity or a specific finding, a trial court must then find that the "expert testimony [is] based on an adequate foundation;

'expert testimony is inadmissible if it is founded on assumptions that have an insufficient factual basis.'" Payne, 277 Va. at 542-43, 674 S.E.2d at 841 (citation omitted).

Because the reliability of fingerprint identification methodology need not be established, Spencer, 240 Va. at 97, 393 S.E.2d at 621, the Commonwealth had the burden to show only that Reeves' opinion had an adequate foundation.[18] Reeves examined all the relevant data, the palm and finger prints lifted from the utility box and those taken from Dowdy, leaving no part of the prints with identification value unidentified. This analysis occurred over a period of days. Reeves reviewed much of the basis for his conclusions during his testimony, identifying both points of agreement that he relied on to make a positive identification and those portions of the print he did not use for lack of the necessary clarity or continuity. Reeves also testified that he turned over his work to another fingerprint examiner so that the accuracy of his conclusions could be verified. Finally, he stated that he did not deviate from the generally accepted practices for latent fingerprint evaluation.

---

[18] When Dowdy moved to strike Reeves' testimony, he acknowledged that he was not challenging the science of fingerprint analysis.

Contrary to Dowdy's argument, the circuit court did not place on him the burden of showing the unreliability of Reeves' testimony.

Therefore, we hold that the circuit court did not abuse its discretion in admitting Reeves' testimony.[19]  Dowdy's contentions go to "factual issues involving the weight of the evidence rather than its admissibility" and as such were for the jury to resolve.  O'Dell v. Commonwealth, 234 Va. 672, 696-97, 364 S.E.2d 491, 505 (1988) (affirming the admission of expert testimony because challenges to the "experience and competence of the examiner . . . and the manner in which [the examiner] did the tests" went to the weight the testimony should be afforded, not its admissibility).

### III.  CONCLUSION

For the reasons stated, we will affirm the judgment of the Court of Appeals upholding Dowdy's conviction for the rape and first-degree murder of Judy Jaimie Coate.

Affirmed.

---

[19] By characterizing Reeves' testimony as not "inherently incredible," the circuit court was commenting on his credibility.  It was not adopting a legal standard for admitting testimony.