COURT OF APPEALS OF VIRGINIA

Present: Judges Frank, Petty and Senior Judge Haley
Argued at Alexandria, Virginia

UNPUBLISHED

ANTHONY WAYNE SIMPSON

v.      Record No. 1283-12-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE JAMES W. HALEY, JR.
NOVEMBER 12, 2013

FROM THE CIRCUIT COURT OF CULPEPER COUNTY
Timothy K. Sanner, Judge

Kirk T. Milam for appellant.

Rosemary V. Bourne, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.

Anthony Wayne Simpson, appellant, was convicted of voluntary manslaughter. On appeal, he contends the trial court erred by: (1) failing to strike a juror for cause, and (2) improperly allowing a blood spatter expert witness for the Commonwealth to testify as to an ultimate issue in the case. Finding no error, we affirm appellant's conviction.

Background

Appellant was charged with the first-degree murder of his adult son. At the beginning of voir dire, the trial court gave preliminary instructions, and asked general questions of the prospective jurors to determine potential bias, including whether any among them had any reason to believe they could not give appellant a fair and impartial trial based on the evidence they heard. During this general voir dire, the trial court asked if any of the venire knew or were related to the victim. A member of the venire responded that she "went to high school" with the victim. The

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

prosecutor later asked the juror whether the fact that she knew the victim would impact her ability to judge the evidence in the trial. The juror replied, "Yes." The prosecutor asked, "In what way?" The juror replied, "I mean, we were just, like, friends in high school."

Later, during individual voir dire, appellant's counsel questioned the juror further about her relationship with the victim and her knowledge of the case. The following exchange took place between appellant's counsel and the juror:

Q: And you went to school with [the victim]?

A: I did. I didn't graduate with him but I have a lot of friends who did and I did know him.

Q: And do you remember when you heard about this, when he was killed?

A: Yes.

Q: What was your reaction to that?

A: I didn't hear it from, like ---I just read it, like, from the newspapers, followed it on Facebook and stuff. You know, I was upset about it.

Q: How often did you see him?

A: I haven't seen him recently at all but I mean, I did know him in school and I know a lot of people who were really close to him.

\* \* \* \* \* \* \*

Q: [D]id you keep in any regular contact with [the victim] over the last couple of years?

A: No. No.

Q: But you knew [him] in school.

A: Uh-huh (indicating yes). I have friends who had recently been in contact with him that were pretty close to him.

Q: And knowing [the victim] the way you knew him, do you think you could be fair in this case based on your reaction to his death?

A: I mean, yeah, like, listening to everything. You know, I obviously only know what I've, like, read and seen so I think I could be fair.

Q: [Y]ou mentioned reading or seeing. What sources did you get information from?

A: The newspaper, the internet, Facebook, stuff like that.

Q: What specific information do you remember getting from the newspaper? Let's start with that.

A: Just that somewhat—whatever the incident was in the newspaper and that he had passed away.

Q: Do you remember how?

A: Not, like, specifically. I've heard, but I don't really know. I've heard, like, a couple of different things.

Q: When you say you've heard a couple of different things, were there other sources where you may have heard these other things?

A: No, not from, like, anybody directly. I've just, you know, what I've, like, read.

Q: And that's what I was getting at.

A: Yeah.

Q: So these friends….

A: I haven't, like, talked to really friends of mine about the situation personally.

Q: You also mentioned the internet. Do you know what information you got from the internet?

A: Just about him passing away. Nothing, like, specific about what happened or anything like that.

Q: Was his death something you spoke about with these mutual friends that you-all had?

A: No, not really, no.

Q: And you don't remember any other information you may have gotten, whether it was from the newspaper or the internet, specifically about what happened in this case?

A: No.

Q: Do you know how he died?

A: No. Like, that's what I've heard, like, stabbed or shot. I don't know, like, I've heard a couple of different things or read a couple different things, saw on, like Facebook and stuff a couple of different things.

Q: But as you sit here today, you couldn't tell us what….

A: No.

Q: One way or the other what actually happened?

A: No.

Q: With the bit of information you have, do you think you could set that aside and start fresh with this trial and be fair to both the Commonwealth and to the defense?

A: Yes, I could. I mean, I don't know. I'm kind of, like, nervous, but I could, yeah, just starting fresh listening to both sides.

Q: Well, you seem kind of hesitant and I'm not trying to press you. Are you nervous and if you are, that's understandable.

A: I'm kind of nervous, yeah.

Q: But I'm just trying to figure out if you could be fair if you sit as a juror in this case.

A: Yeah, I could be fair.

Q: And set aside whatever little bit of information you may have gathered before today or that you know about?

A: Yes.

At the conclusion of the voir dire, appellant's counsel stated to the trial court that the juror's answers "satisfied me." Appellant's counsel then moved to strike the juror for cause, arguing that if the juror was not struck, her friendship and "mutual acquaintances" might "influence" her during deliberations which could "potentially affect the rest of the jurors." Appellant's counsel also stated he thought the juror was sincere in her answers and she wanted

- 4 -

"to be fair." He stated he was making the motion to strike the juror for cause "kind of with some hesitancy."

The trial court overruled the objection, stating:

> [D]espite the [c]ourt's recollection that she may have indicated some difficulty in being impartial during the general voir dire, the [c]ourt observed her very carefully as she answered the questions that were posed to her by [appellant's counsel]. . . . The [c]ourt [finds] that most of her outward demeanor at least is a function of being nervous. She was frank about that. [S]he was open about her answers, did not appear to be holding back, if you will. The [c]ourt finds no basis to believe that she would be unable to follow the [c]ourt's instructions and to put aside any notion she had or has indicated she had and be fair and impartial in the case.

During the trial, a forensic pathologist testified the victim suffered a fatal gunshot wound to his neck fired from an intermediate range. She stated intermediate range can be anywhere from inches to two feet. Appellant did not deny shooting the victim, but he maintained he acted in self-defense.

After the shooting, a deputy sheriff found the victim's body in a storage area or porch located next to the kitchen of appellant's house. An investigator took photographs of the crime scene that were analyzed by a blood stain pattern analyst, Marjorie Harris. Harris testified she views blood deposits and determines the manner in which they were distributed by analyzing the characteristics of the deposits. She stated the source of the blood in this case was an injury to the victim's neck and nose. Harris viewed one of the photographs of the crime scene, and she described it as a photograph of the threshold between the kitchen and the adjacent room. She stated both the floor and the "divider" contained round, circular stains "which are those drip stains that are formed through gravity and just fall straight down to the ground." The prosecutor asked Harris whether she had an opinion regarding where the victim was located when he sustained his injury. Harris testified, "That blood began to flow when the injury occurred and that blood flow began at or near the threshold of the kitchen."

Appellant objected to the testimony, arguing that Harris's opinion testimony invaded the province of the jury on the ultimate fact in issue. The trial court overruled the objection, finding that Harris's testimony was not an opinion on the ultimate fact in issue.

Appellant appealed the trial court's rulings to this Court.

Analysis

Both the Virginia and United States Constitutions protect a defendant's right to be tried by an impartial jury. Va. Const. art. I, § 8; U.S. Const. amend. VI. To qualify as a juror, a venireman must "stand indifferent in the cause," Code § 8.01-358, and any reasonable doubt regarding her impartiality must be resolved in favor of the accused, Breeden v. Commonwealth, 217 Va. 297, 298, 227 S.E.2d 734, 735 (1976).

In assessing the responses of the member of the venire, the trial court must assess "whether her answers during voir dire . . . indicate to the court something that would prevent or substantially impair the performance of [her] duties as a juror in accordance with [the court's] instructions and [the juror's] oath." Andrews v. Commonwealth, 280 Va. 231, 256, 699 S.E.2d 237, 251 (2010) (internal quotation marks omitted) (alterations in original).

> "On appellate review, we give deference to the trial court's determination whether to exclude a prospective juror, because the trial court was able to see and hear each member of the venire respond to the questions posed. Thus, the trial court is in a superior position to determine whether a juror's responses during voir dire indicate that the juror would be prevented or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath."

Thomas v. Commonwealth, 279 Va. 131, 164, 688 S.E.2d 220, 238 (2010) (quoting Lovitt v. Commonwealth, 260 Va. 497, 510, 537 S.E.2d 866, 875 (2000)).

On appeal, the decision of the trial court with regard to a particular prospective juror is reviewed for "manifest error amounting to an abuse of discretion." Andrews, 280 Va. at 256, 699 S.E.2d at 251.

Appellant contends the juror's initial response and her equivocation during voir dire outweigh her later answers to leading questions posed to her, creating a doubt as to her impartiality. Yet appellant's counsel himself expressed the belief that the juror's answers "satisfied" him and that "she was being sincere with the [c]ourt and her wanting to be fair." Furthermore, the juror responded to the questions posed by appellant's counsel that she "could be fair" and she did not know anything "specific" about the case. She also agreed that she could set aside what information she had concerning the case, "start fresh," and listen to the evidence presented by both sides. Given the juror's responses, particularly her responses to the questions posed by appellant's counsel, the acknowledgements of the juror's responses by appellant's counsel, and the trial court's specific findings, we can find no manifest error amounting to an abuse of discretion.

Appellant also argues the trial court improperly allowed the blood spatter expert witness to testify about the ultimate issue in the case. The ultimate issue in this case was whether appellant committed an unlawful homicide when he shot the victim.[1]

"[T]he admissibility of expert testimony is within the sound discretion of the trial court, and that court's decision will not be disturbed absent an abuse of discretion." Patterson v. Commonwealth, 3 Va. App. 1, 11, 348 S.E.2d 285, 291 (1986).

> It is well settled in Virginia that the opinion of an expert witness is admissible "where 'the jury, . . . is confronted with issues'" that "'cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience gained in the ordinary affairs of life'" and thus require "'scientific or specialized knowledge.'"

---

[1] The ultimate issue of fact in a criminal case is whether the accused committed the elements of the crime. See Nicholas v. Commonwealth, 91 Va. 741, 750, 21 S.E. 364, 367 (1895).

Schooler v. Commonwealth, 14 Va. App. 418, 420, 417 S.E.2d 110, 111 (1992) (quoting

Compton v. Commonwealth, 219 Va. 716, 726, 250 S.E.2d 749, 755-56 (1979)). See also

Dowdy v. Commonwealth, 278 Va. 577, 600, 686 S.E.2d 710, 723 (2009).

> "[W]hile an expert witness may be permitted to express his opinion relative to the existence or nonexistence of facts not within common knowledge, he cannot give his opinion upon the precise or ultimate fact in issue, which must be left to the jury or the court trying the case without a jury for determination."

Llamera v. Commonwealth, 243 Va. 262, 264, 414 S.E.2d 597, 598 (1992) (quoting Webb v.

Commonwealth, 204 Va. 24, 33, 129 S.E.2d 22, 29 (1963)).

In Compton, the Supreme Court of Virginia held that testimony explaining blood spatter

evidence was admissible expert testimony because it was a "matter beyond the scope or

knowledge of the average juror and w[as a] matter[] within the peculiar knowledge, science and

skill of" the expert witness. Compton, 219 Va. at 727, 250 S.E.2d at 756. In addition, "every

fact, however remote or insignificant, that tends to establish a probability or improbability of a

fact in issue is admissible." Stamper v. Commonwealth, 220 Va. 260, 269, 257 S.E.2d 808, 815

(1979).

At trial, appellant argued the blood stain pattern analyst, Harris, should not be permitted

to testify because the jury was best suited to determine "what the blood spatter means."

Appellant further contended it was for the jury to decide from the photographs of the crime scene

where the victim was standing when he was shot. Harris testified that, in her opinion, "blood

began to flow when the injury occurred and that blood flow began at or near the threshold of the

kitchen." The trial court overruled appellant's objection, stating that Harris's opinion did not

address the ultimate issue of fact in the case.

Appellant was charged with first-degree murder. At trial, appellant admitted he fired the

shot that killed the victim. However, he asserted he acted in self-defense. The Commonwealth

sought to establish through the blood spatter pattern analyst the approximate position of the victim at the time the fatal shot was fired. This was an evidentiary fact useful to the jury in deciding the ultimate fact in issue--whether appellant committed an unlawful homicide. The mere fact that an expert witness' opinion tends to prove the ultimate issue of fact does not preclude an expert from testifying "'where [the] jury, . . . is confronted with issues' that 'cannot be determined intelligently merely from the deductions made and inferences drawn on the basis of ordinary knowledge, common sense, and practical experience.'" Schooler, 14 Va. App. at 420, 417 S.E.2d at 111.

The testimony concerning the blood spatter evidence involved a matter beyond the scope or knowledge of the average juror and was a topic within the peculiar knowledge, science, and skill of the expert witness. Indeed, the Supreme Court has stated that blood spatter analysis "involves the application of principles of physics, chemistry, biology, and mathematics." Smith v. Commonwealth, 265 Va. 250, 252, 576 S.E.2d 465, 467 (2003). "Depending on the type of stain and the circumstances, a number of different conclusions can be reached, such as the cause of the stain, its point of origin, and the direction in which the blood droplets were going at impact." Id. The Court further noted that many jurisdictions have held that blood spatter analysis is reliable because it is "'clearly a well-recognized discipline, based upon the laws of physics, which undoubtedly assist[s] the jurors in understanding what occurred.'" Id. (quoting State v. Rodgers, 812 P.2d 1208, 1212 (Idaho 1991)).

Therefore, Harris's testimony was admissible as evidence useful to the jury, but it did not violate the ultimate issue rule. The testimony tended to show, but did not conclusively prove, the physical evidence at the scene was not consistent with appellant's self-defense theory. Harris did not testify that the blood spatter evidence was consistent with an unlawful homicide, the ultimate

question before the jury.  Accordingly, the trial court did not abuse its discretion by admitting the expert witness' testimony.

For these reasons we affirm appellant's conviction.

<u>Affirmed.</u>