PRESENT:  Goodwyn, C.J., Kelsey, McCullough, Chafin, Russell, and Mann, JJ., and Mims, S.J.

COMMONWEALTH OF VIRGINIA

v.  Record No. 220382

JOSEPH EUGENE SMITH

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
February 29, 2024

FROM THE COURT OF APPEALS OF VIRGINIA

This appeal presents several issues in connection with Joseph Eugene Smith's convictions for statutory rape and object sexual penetration of a child under the age of thirteen: (1) whether the circuit court abused its discretion in declining to provide funds to retain several experts who would assist Smith in challenging his confession, (2) whether the inadvertent recording of video consultations between Smith and his attorney when Smith was at the jail warranted the dismissal of the indictments when neither the police nor the prosecution listened to those conversations, and (3) whether Smith's mandatory life sentence is constitutional.  A panel of the Court of Appeals reversed the judgment of the circuit court on the basis that it abused its discretion in declining to provide Smith with funds for Smith to retain several experts.  We conclude that the circuit court did not abuse its discretion in the manner in which it addressed Smith's multiple requests for expert assistance and, accordingly, we reverse the judgment of the Court of Appeals on those holdings.  We affirm the Court of Appeals' refusal to dismiss Smith's indictment on the basis of the inadvertently recorded video conferences between Smith and his counsel because the record establishes that Smith suffered no prejudice.  Finally, we conclude that Smith's mandatory life sentence for the rape of a young child does not infringe the Eighth Amendment.

BACKGROUND

I.       PRETRIAL MOTIONS SEEKING EXPERT ASSISTANCE UNDER *AKE* AND *HUSSKE*.

Joseph Eugene Smith was charged with four counts of rape and one count of object sexual penetration of a child under the age of thirteen. Smith filed a number of pretrial motions seeking funds for an expert to challenge his confession. Smith first filed a motion requesting $2,500 to consult with an expert on the "coercive nature of custodial interrogations and false confessions." The circuit court granted that motion without a hearing.

Soon afterwards, invoking *Ake v. Oklahoma*, 470 U.S. 68 (1985) and *Husske v. Commonwealth*, 252 Va. 203 (1996), Smith filed a second motion to obtain funds to consult with another expert. Smith sought to hire Dr. Jeffrey Aaron to assist Smith on the subject of mental deficits that make a person vulnerable to coercive interrogation tactics. Dr. Aaron is a licensed clinical psychologist and a professor of psychiatry and neurobehavioral sciences. In support of the motion, Smith noted that the key pieces of evidence against him are the testimony of the alleged victim and his own confession. He further stated that he had previously been under the care of a psychologist and lacked the basic skills to care for himself.

Smith filed an additional motion to obtain funds to consult with a law professor, Professor Alan Hirsch, on the subject of coercive police tactics such as the "Reid" method of interrogation.[1]

At a hearing on the motions, addressing Dr. Aaron, the circuit court indicated that a generalized allegation of mental deficiency, combined with being seen by a psychiatrist, did not differentiate Smith from countless other defendants. The circuit court noted that Smith had not

---

[1] The record variously refers to the Reid school of interrogation, the Reid technique, and the Reid techniques, plural. For the sake of simplicity, we will generally refer to the "Reid method" to describe the techniques that police employed to question Smith.

alleged that he suffered from any particular mental disorder that would have an impact on Smith's vulnerability to a false confession. Counsel for Smith indicated that she was seeking to obtain medical records and to identify the psychologist who treated Smith. The circuit court responded that there are ways to obtain such records, and that while it was denying the motions, it was not closing the door on providing funds for an expert. The circuit court further stated that the jury could view the video of the interrogation and evaluate the impact of the police tactics and so Smith did not require an expert on the subject of police interrogation tactics. The circuit court denied both motions.

Several months later, Smith filed a renewed motion for expert assistance, again requesting funds to consult with Dr. Aaron. Amplifying his prior motion, Smith pointed out that he was diagnosed with HIV in 2009, and that he was treated by Dr. Daniel Nixon. When Smith was first treated, his viral load was very high. Such elevated viral loads can lead to lasting cognitive limitations and neurological dysfunction. Smith was also treated by Dr. Christopher Kogut, a psychiatrist. Smith was diagnosed with depression and received medication. Since 2009, he had visited a psychiatrist approximately 30 times. Attached to his submission to the circuit court on the renewed motion, Smith included an academic article about HIV-associated neurocognitive dysfunction, or HAND.[2] Smith noted that his treating doctor concluded that Smith "fit the profile" for HAND but acknowledged that Smith had not been diagnosed with this condition.

During the hearing on the motion, the circuit court inquired "what kind of doctor tests the limitations that could make a causative connection between the – this HIV and the cognitive

---

[2] The term HAND "has been used to describe the range of neurocognitive dysfunction associated with HIV infection." Deanna Saylor, et al, HIV-associated neurocognitive disorder— pathogenesis and prospects for Treatment, Nat. Rev. Neurol. 234 (April 2016).

3

impairment?" Defense responded that "I don't know that there is a doctor that would definitively say that his limitations are a result of HIV-associated neurocognitive dysfunction. I don't know that there's a doctor who could make that." Counsel observed that Dr. Aaron could determine whether Smith has cognitive limitations, but was not sure whether Dr. Aaron could associate this limitation with any diagnosable disease. Counsel also was uncertain whether any doctor could "definitively say that [Smith's] limitations are a result of [HAND]." Counsel also did not know "what further testing would be done to get [a HAND] diagnosis."

The circuit court denied the motion. The circuit court observed that "fitting the profile" for HAND was not enough to link Smith's HIV diagnosis to any alleged cognitive impairment. A diagnosis of depression, the circuit court reasoned, would not be enough to warrant expert testimony because depression is a common disorder, and the jury could understand and evaluate the effects of depression on an interrogation. A jury, however, could not be expected to understand "all the ramifications of a complex mental diagnosis." The circuit court indicated that Smith had "a path" to obtain funds for expert assistance: Smith needed an expert who could provide a diagnosis that he suffers from a medical condition that is beyond the understanding of a jury. The circuit court added that a diagnosis based on academic literature was insufficient. The evidence, the circuit court indicated, needed to "link [a diagnosis] to this individual." The circuit court made it clear it had not "shut the door completely" to providing funds for an expert.

With remarkable zeal, Smith's counsel returned several weeks later with a motion for funds to employ an expert, Dr. Scott Bender. According to Smith, Dr. Bender could perform a neuropsychological evaluation of Smith to determine if Smith was "experiencing HIV associated neurocognitive dysfunction." The motion noted that Smith's daughter observed Smith's deterioration over the past 6 to 8 years. The motion also cited his difficulty in managing his

4

finances, keeping track of his day-to-day responsibilities, and understanding things. Moreover, Smith's medical records indicated that the viral load associated with his severe HIV and, in particular, his low CDT-4 T cell count, was a predictor for neurocognitive impairment. Counsel for Smith noticed that Smith had difficulty understanding the concepts counsel tried to communicate to him. Finally, Smith presented a variety of risk factors for HAND and counsel asserted that he had a majority of them. An article Smith attached stated that HAND "is diagnosed using neuropsychological testing and functional status assessments."

Following argument from counsel on the motion, the circuit court denied the motion to provide funds for a neuropsychological evaluation. The circuit court explained that HAND is a "multifaceted diagnosis" that requires a range of testing beyond neuropsychological testing. The circuit court observed that a HAND diagnosis requires a variety of tests, including an MRI and blood tests. The circuit court expressed doubts that a neuropsychologist was the appropriate expert. The circuit court agreed that a neuropsychological evaluation was "one piece of it" but noted that a HAND diagnosis requires "a battery of tests."[3] On this reasoning, the circuit court denied the motion to grant funds to hire Dr. Bender as an expert. The circuit court, however, granted Smith funds to hire Professor Hirsch as an expert. The circuit court imposed a condition,

_____

[3] The trial court's statement that a neuropsychological evaluation alone is insufficient for a HAND diagnosis appears to be well supported. *See* Michael Elyas, Jung Haziot et al., *Neuroimaging of HIV-associated Neurocognitive Disorders*, Dementia & Neuropsychologia, Oct.-Dec. 2015, at 381 (noting that "[a]n anatomical imaging study with CT [Conventional Computed Tomography] or MRI [Magnetic Resonance Imaging) is often the initial step in the diagnostic approach for HAND"). An HIV Guide from Johns Hopkins Medicine about HAND notes that "[w]orkup once HAND is suspected includes brain MRI, neuropsychological testing, serologic testing as needed to rule out vitamin deficiency and syphilis because the diagnosis is one of exclusion." *See* Lisa A. Spacek & Christopher J. Hoffmann, *HIV-Associated Neurocognitive Disorder (HAND)*, https://www.hopkinsguides.com/hopkins/view/Johns_Hopkins_HIV_Guide/545054/all/HIV_ass ociated_neurocognitive_disorder__HAND_ (Oct. 9, 2022).

however, on Hirsch's trial testimony: Smith would have to proffer the testimony in advance, as well as any other witnesses who could connect Hirsch's testimony to Smith's individual characteristics.

The Commonwealth later filed a pretrial motion to exclude all expert testimony on false confessions, coercive police tactics, and Smith's mental state. Smith opposed the motion and submitted a proffer of Hirsch's testimony. Smith proffered that Hirsch would testify, first, to "the surprising frequency of false confessions" and "the interrogation methods known to contribute to them." Second, Hirsch would testify to the "characteristics that make an individual more susceptible to giving a false confession." Finally, Hirsch would testify to the aggressive manner in which the police applied the Reid method in Smith's interrogation. Smith also argued that police interrogations, the Reid method, and the fact that some individuals are more susceptible to those tactics, were all issues beyond a jury's common understanding.

Following a hearing, the circuit court granted the Commonwealth's motion to exclude Hirsch as an expert. The circuit court reasoned that Hirsch's proposed testimony on the "surprising frequency of false confessions" was not based on any empirical data and was not relevant to Smith's interrogation. The circuit court observed that "regardless of whether I use the *Spencer* or the *Daubert*, or the 2:702 standard,[4] I just don't think it meets the test for that based on this proffer and what you've argued up until today about Alan Hirsch." The circuit court further held that Hirsch, a law professor, was not qualified to testify about characteristics— including mental health disorders—that make an individual more susceptible to providing a false confession. Third, the circuit court held that Hirsch's testimony on the Reid method was unnecessary because the jury could watch recorded footage of the interrogation and competently

---

[4] The circuit court was referring to Virginia Rule of Evidence 2:702.

6

evaluate the interrogating officer's tactics. Finally, the circuit court held that depression and anxiety were within the jury's common knowledge.

A few months later, Smith filed a motion to reconsider, renewing the request for $7,000 in expert funds. This time, Smith sought to retain Dr. Jeffrey Aaron "for consultation, evaluation of the Accused, trial preparation and testimony." Alternatively, in the event the circuit court had concerns about the admissibility of such testimony, Smith asked for $1,050 so that counsel could "secure Dr. Aaron's presence at a future hearing to determine the admissibility of his testimony." Smith argued that because Dr. Aaron was a psychiatrist, he was qualified to evaluate Smith and testify about the psychological factors that can contribute to false confessions. The circuit court stated that it would provide Smith with "funds to bring him here, you voir dire him prior to trial and then the Court will decide whether that testimony is admissible or not." The circuit court explained that an expert could testify about factors that made an individual more susceptible to false confessions but needed to "connect the dots" to show that Smith actually had some of the characteristics. The circuit court granted Smith $2,000 for Dr. Aaron to consult and evaluate Smith, and for possible testimony. Dr. Aaron never appeared, either for a hearing to determine the admissibility of his testimony, or at trial.

II.  MOTION TO DISMISS FOR RECORDING TWO ATTORNEY-CLIENT VIDEO CONSULTATIONS WHILE SMITH WAS AT THE JAIL.

Smith filed a pretrial motion to dismiss for outrageous government misconduct. The motion was based on recordings the Richmond Sheriff's Office made of videoconference consultations between Smith and his attorney while Smith was held at the jail. Due to the pandemic, the Sheriff's Office sometimes restricted visits between counsel and their clients to video conferences. The Commonwealth's Attorney disclosed the existence of those recordings to defense counsel.

7

At a hearing on the motion, a representative of the Sheriff's Office explained that professional visits between attorneys and their clients should not have been recorded but some visits inadvertently were recorded. To avoid recording a visit, a setting on the system needed to be changed and evidently it was not. Some of the recorded calls involved privileged discussions between counsel and Smith about trial strategy.

Although the conversations were recorded, nobody from the Sheriff's Office actively monitored the conversations as they were taking place. And no one from the Sheriff's Office later listened to the videoconferences. The lead detective in the Richmond Police Department likewise did not listen to any of the privileged attorney-client discussions. Two recruits from the police department did listen to some of the phone calls Smith made, but not to the video conferences between Smith and his attorney. The prosecutor who tried the case told the circuit court she had not listened to any of the recordings.

The circuit court held that the prosecution could not use any recordings that contained privileged information. The circuit court, however, denied the motion to dismiss, observing that no evidence established that the recordings were purposeful.

III.    JURY TRIAL AND APPEAL TO THE COURT OF APPEALS.

At a jury trial, the Commonwealth presented the testimony of M.L., who testified that Smith repeatedly raped her and engaged in object sexual penetration in a variety of places and over a long period of time. Initially, Smith was dating M.L.'s mother, and M.L. viewed him as a father figure. She described how Smith would buy her things. M.L. testified that Smith began raping her when she was just seven years old, and he continued to rape her repeatedly until she was thirteen, when she revealed the abuse. She testified that he raped her "too many times to count."

8

Based on M.L.'s accusations, police contacted Smith. He agreed to drive down to the Social Services Department. At that stage, police asked him open ended questions about his relationship with M.L., whether she spent the night with him, whether he bought her things, and other questions. A detective asked Smith on several occasions whether he ever touched her inappropriately. Smith answered in the negative. The next day, a detective called him to arrange for another meeting and Smith agreed. The meeting took place almost two weeks later.

At the outset of the interrogation, the detective informed Smith that he could go home if he wished to—and he did, in fact, go home at the conclusion of the interrogation. Smith arrived at 12:10 p.m. and left at 3:57 p.m. Detectives did not question Smith continuously, and he was given restroom and other breaks. Smith spoke with two detectives, Detectives Stone and Clark. Smith was not handcuffed or restrained in any way. Detective Clark told Smith that he was speaking to her voluntarily and that he was free to leave any time. Both detectives spoke to Smith in a calm, relaxed voice, and there was no yelling. Neither detective made threats to Smith about what the government might do. According to Detective Clark, Smith told the detectives that he had been diagnosed with depression and anxiety, that he had not taken his anxiety medication in some time, and that he had not eaten breakfast or lunch that day. But Detective Clark observed that Smith had no difficulty answering "no" when he did not agree, and that he was able to answer the questions independently.

When asked about a sexual relationship with M.L., Smith initially denied any such relationship. After a break, Detective Clark changed her approach and told Smith she did not believe him. Smith volunteered that all he did with M.L. was "a little grind." But he eventually confessed to a sexual relationship with M.L., although he initially stated that it began when she

9

was ten years old.  Smith confessed to many specific acts and repeatedly apologized for those actions.

In their trial testimony, both detectives acknowledged they were trained in the Reid method for interrogation, as well as other techniques.  Defense counsel questioned Detective Clark extensively about the Reid method, which involves confronting suspects with evidence of their guilt.  The questioner displays unwavering certainty about the suspect's guilt and does not allow the suspect to deny the crime.  The Reid method also involves "theme development," whereby the questioner seeks to minimize the suspect's guilt.  For example, the questioner might ask a suspect "[a]re you the worst bank robber in all of the world or are you somebody who just made a mistake and robbed the bank just one time?"  Detective Clark told Smith that she did not believe his denials, and that she believed M.L.  She also testified that she gave Smith room to answer.  Detective Clark acknowledged that the method should be used with caution when dealing with juveniles and persons with a mental impairment.

Smith testified that he never raped M.L. or placed his fingers inside her.  Smith's daughter testified to the difficulty he experienced handling stress and expressing himself.  She also testified that she had to help him set up appointments and pay his bills.

The jury convicted Smith of two counts of raping a child under the age of 13, as well as object sexual penetration of a child under the age of 13, and he received a life sentence on each of his three convictions.  The jury acquitted Smith of two of the rape charges.

Smith filed a post-trial motion in which he argued that his mandatory life sentence was unconstitutional.  The circuit court denied the motion.

On appeal, a panel of the Court of Appeals reversed Smith's convictions.  *Smith v. Commonwealth*, Record No. 0680-21-2 (May 17, 2022) (unpublished).  The Court of Appeals

held that the circuit court abused its discretion in refusing to permit Smith to present expert testimony from a qualified expert on the susceptibility of a person suffering from mental illness, including major depression and unmedicated anxiety, to making a false confession. Slip op. at 9, 12-13. Additionally, the Court of Appeals found that the circuit court erred in declining to provide funds so that Smith could be evaluated for HAND. Slip. op. at 9. However, the Court of Appeals held that the circuit court did not abuse its discretion in rejecting expert testimony on the Reid method. Slip op. at 15-18. Finally, with respect to his claim that attorney-client communications were improperly recorded by the Sheriff's Office, the Court of Appeals held that Smith had not shown any prejudice and affirmed the circuit court on that issue. Slip op. at 20. The Court of Appeals did not address the constitutionality of Smith's mandatory minimum life sentence. Slip op. at 7.

We granted the Commonwealth an appeal from the decision of the Court of Appeals.

### ANALYSIS

I.   THE COURT OF APPEALS ERRED IN REVERSING SMITH'S CONVICTION BASED ON AN ARGUMENT FOR WHICH THERE WAS NEITHER AN ASSIGNMENT OF ERROR NOR ARGUMENT.

"Expert testimony is admissible if the area of expertise to which the expert will testify is not within the range of the common experience of the jury." *Pritchett v. Commonwealth*, 263 Va. 182, 186-87 (2002). The Court of Appeals held that "major depression," combined with the fact that Smith had not taken medication for his anxiety for many months prior to his interrogation, differentiated this case from ordinary circumstances involving depression and anxiety. This difference, the Court of Appeals held, rendered the circuit court's refusal to permit expert testimony concerning Smith's major depression and unmedicated anxiety an abuse of discretion. *Smith*, slip op. at 12.

11

The Commonwealth argues that the Court of Appeals erred when it reversed Smith's convictions on a ground he did not assign error to or argue, namely, that the circuit court erred by denying funds and expert testimony on the effects of major depression and unmedicated anxiety on an individual's susceptibility to false confessions. The Commonwealth contends that Smith challenged the circuit court's refusal to allow him to provide expert testimony concerning the Reid method. Smith did not assign error to, or argue, that the circuit court erred by refusing to permit him to provide expert testimony to explain the impact of his "major depression" and his failure to take his anxiety medication on his confession.

Our Rules provide that "[o]nly assignments of error listed in the brief will be noticed by [the Court of Appeals]." Rule 5A:20(c)(1). Rule 5A:20(e) requires an opening brief to contain "the argument—including principles of law and authorities" for each assignment of error. The relevant assignment of error in Smith's brief in the Court of Appeals was that "The trial court erred by denying an expert to *evaluate* Mr. Smith for HIV-Associated Neurocognitive Disorder (HAND) or another cognitive disorder." (Emphasis added.) Smith did not ask to be *evaluated* for depression or anxiety — it was common ground that he had been diagnosed with, and been treated for, those conditions. Although Smith mentioned his depression and anxiety diagnosis in his brief, particularly in his statement of the case, even a generous reading of his assignments of error and argument cannot be stretched to cover the point on which the Court of Appeals reversed the judgment of the circuit court. In other words, Smith did not contend in the Court of Appeals that the trial court erred in failing to provide funds for an expert to testify concerning the effects of "major" depression and "unmedicated" anxiety on his interrogation. His argument centered around a potential HAND diagnosis and the use of the Reid method.

The Court of Appeals may not reverse a circuit court's judgment on a basis not argued on appeal by the appellant. *Commonwealth v. Brown*, 279 Va. 235, 241-42 (2010); *Clifford v. Commonwealth*, 274 Va. 23, 25 (2007). Accordingly, we reverse the Court of Appeals' holding that the circuit court abused its discretion in refusing to permit expert testimony to challenge Smith's confession on the basis of his major depression and failure to take medication before his interrogation.[5]

II. THE COURT OF APPEALS ERRED IN HOLDING THAT THE CIRCUIT COURT ABUSED ITS DISCRETION IN THE WAY IT ADDRESSED EXPERT TESTIMONY CONCERNING THE HAND DIAGNOSIS AND ITS IMPACT ON SMITH'S CONFESSION.

The due process guarantee of fundamental fairness requires the state to provide an indigent criminal defendant with the "basic tools of an adequate defense," which may include assistance from an expert. *Husske*, 252 Va. at 209-10 (quoting *Ake,* 470 U.S. at 77). Smith filed a number of motions seeking expert assistance to challenge his confession.

> [A]n indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is "likely to be a significant factor in his defense," and that he will be prejudiced by the lack of expert assistance.

*Id.* at 211-12 (citation omitted). A defendant seeking the assistance of an expert witness "must show a particularized need" for that assistance. *Id.* The defendant must shoulder the burden of demonstrating this "particularized need" by establishing that an expert's services would materially assist him in preparing his defense and that the lack of such assistance would result in a fundamentally unfair trial. *Id. See* Code § 19.2-266.4(B). In evaluating the question of prejudice, the trial court must determine "based on the facts of the particular case, the probable

---

[5] Anxiety and depression can vary greatly in severity. Whether a defendant who suffers from anxiety and depression is entitled to expert assistance to challenge his or her confession will depend on the circumstances of each case.

13

value of providing the requested assistance and the risk of error in the criminal proceeding if such is not provided." *Dowdy v. Commonwealth*, 278 Va. 577, 593 (2009).

Whether a defendant has made the required showing of particularized need is a determination that lies within the sound discretion of the trial court. *Id.* at 595. "In evaluating whether a trial court abused its discretion, . . . 'we do not substitute our judgment for that of the trial court. Rather, we consider only whether the record fairly supports [that] action.'" *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009) (quoting *Beck v. Commonwealth*, 253 Va. 373, 385 (1997)).

Expert testimony must address issues beyond the "common experience of the jury." *Pritchett*, 263 Va. at 186-87. The trial court could conclude on these facts that Smith's depression, anxiety, and various other aspects of Smith's psychological makeup—such as his difficulty paying bills—were issues that the jury could address without expert testimony. That ruling is not before us. The circuit court here inquired about the existence of a complex medical diagnosis that would be beyond the understanding of a jury. When engaging with counsel concerning Smith's multiple requests for expert assistance, the circuit court repeatedly indicated that it was open to allocating funds for an expert if Smith found a qualified expert who could reach a diagnosis of HAND or demonstrate a specific diagnosis beyond the understanding of the jury, and who could then "connect the dots" to demonstrate a link between Smith's mental condition and the possibility of a false confession. The circuit court did not impose any limitations beyond those sensible strictures. Ultimately, of course, the circuit court, in fact, granted Smith funds to hire Dr. Aaron and determine whether his testimony was admissible during a pretrial hearing. Strikingly, Dr. Aaron did not appear, either to testify outright or proffer what his evaluation or testimony may have been.

We conclude that the circuit court's rulings on the defense motions for expert assistance, whether for evaluation or potential trial testimony, did not constitute an abuse of discretion. To the contrary, the record reflects the fact that the circuit court approached these issues methodically, thoughtfully, and thoroughly, and expressly provided a path for the defense to obtain expert assistance. The circuit court could sensibly conclude that allegations of a *potential* diagnosis of HAND, combined with commonly experienced circumstances such as depression and anxiety, did not rise to the level of a particularized need under *Husske*. The circuit court's insistence on an expert or experts who were qualified to make a complex diagnosis, and who could then relate that diagnosis to the potential for making a false confession, were within the bounds of the circuit court's discretion. Accordingly, we reverse the judgment of the Court of Appeals.[6]

III.   THE COURT OF APPEALS CORRECTLY AFFIRMED THE CIRCUIT COURT'S DECISION TO EXCLUDE EXPERT TESTIMONY ON THE REID METHOD OF INTERROGATION.

Smith assigns cross-error to the circuit court's refusal to permit a law professor to testify as an expert to challenge the Reid method the police employed when questioning Smith. We note as an aside that, early on in the case, the circuit court did provide funds for defense counsel to consult with an expert on false confessions, in order to prepare the defense in this case.

Smith proffered that Hirsch would testify to three things: (1) the frequency of false confessions, (2) characteristics that make an individual more susceptible to making false confessions, and (3) the interrogators' aggressive application of the Reid method in this case.

---

[6] Although we hold that the circuit court's rulings were within the bounds of its discretion, we make no broad pronouncements in this decision on the question of whether trial courts should or should not appoint an expert to assist a defendant who seeks to challenge a confession. "Whether an indigent defendant makes that showing [of particularized need] is determined on a case-by-case basis." *Dowdy*, 278 Va. at 595.

15

Turning to the first component of Hirsch's proffer, the surprising frequency of false confessions, the circuit court concluded that empirical data did not support the conclusion about the surprising frequency of false confessions. The circuit court observed that "regardless of whether I used the *Spencer* or the *Daubert*, or the 2:702 standard, I just don't think it meets the test for that based on this proffer." Smith does not point us to any evidence that the circuit court was wrong on this point. The circuit court did not misapply the standard for admitting expert testimony, it was simply noting that under any of those standards, Hirsch's proffer was unreliable. We agree with the circuit court.

On the second paragraph of Hirsch's proffer, the defense stated that Hirsch would testify to the "characteristics that make an individual more susceptible to giving a false confession." The circuit court noted that Hirsch is a law professor, not a psychologist, and that the only conditions for which Smith was actually diagnosed were anxiety and depression. The circuit court observed that anxiety or depression were present in nearly every case, fell within the common experience of the jury, and did not suffice to justify expert testimony. Moreover, Hirsch was not qualified to connect the characteristics of this specific defendant to an increased vulnerability to making a false confession. The defense never proffered any sort of complex medical diagnosis. The circuit court explained that it would need to see evidence that would "connect the dots" between (1) a diagnosed medical condition that would be beyond the ordinary understanding of a juror and (2) that particular condition placing a suspect at risk of providing a false confession. For whatever reason, the defense did not bring Dr. Aaron to court, to make a proffer or otherwise. We also note that Smith proffered an article stating that sixty-six percent of experts who had studied interrogations or confessions agreed that jurors would understand as a matter of common sense that "individuals who have intellectual disabilities are particularly

16

vulnerable to the pressures of social influence." *See* Saul M. Kassin et al., *On the General Acceptance of Confessions Research: Opinions of the Scientific Community*, 73 Am. Psychologist 63, 72 (2018). Under these circumstances, the trial court did not abuse its discretion by excluding this aspect of Hirsch's testimony.

Moreover, the circuit court's decision concerning the expert should be viewed in tandem with the evidence that was offered at trial. The jury heard evidence that Smith suffered from anxiety and depression, had some memory problems, and heard from his daughter about his difficulties in handling bills and stressful situations. The circuit court admitted Smith's medical records into evidence. The lead detective acknowledged that, as "a part of [her] training [on the Reid method, she] learned there are certain types of people – certain classes of people where you should use the Reid [method] with caution." The detective further agreed that among those persons are juveniles, persons "with any sort of mental impairment," and persons with "intellectual delays" or "mental illness." The detective agreed that such vulnerabilities can render these persons "more susceptible" and that they may experience difficulties understanding or communicating.

With respect to the final component of Hirsch's proffer, that the police aggressively applied the Reid method, the circuit court concluded that expert testimony was unnecessary because the jury could see for itself how the police interrogated Smith. At trial, defense counsel cross-examined the detectives who questioned Smith about the Reid method, elicited evidence that they were trained in the techniques that comprise the Reid method of interrogation, and provided examples of how the techniques are employed. Counsel previewed this line of questioning during opening statements, informing the jury that the lead detective had been "trained in an aggressive interrogation tactic that you will hear is called the Reid method from

17

the John E. Reid School of Interrogation. A method that is falling out of favor." Counsel questioned the lead detective about how she employed some of these techniques while interrogating Smith. The jury viewed the video of Smith's interrogation and heard testimony about the additional circumstances bearing upon his confession. On this record, therefore, the circuit court did not abuse its discretion in declining to allow expert testimony on this aspect of Hirsch's testimony because the jury could see for itself how the police interrogated Smith.

IV. THE SHERIFF'S RECORDING OF ATTORNEY-CLIENT DISCUSSIONS DID NOT WARRANT DISMISSAL WHEN THE DEFENDANT SUFFERED NO PREJUDICE.

In an assignment of cross-error, Smith contends that the Court of Appeals should have reversed the circuit court for failing to dismiss the indictments based on the recording of several videoconferences he had with his attorney. In *Gheorghiu v. Commonwealth*, the Court of Appeals, relying upon precedent from the United States Supreme Court, correctly noted that "[d]ismissal is rarely the appropriate remedy when faced with a violation of the right to counsel." 54 Va. App. 645, 677 (2009), *rev'd in part on other grounds*, 280 Va. 678 (2010) (citing *United States v. Morrison*, 449 U.S. 361 (1981)).

In *Morrison*, the United States Supreme Court observed that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." 449 U.S. at 364. In this context, "the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant [has been] convicted." *Id.* at 365. "More particularly, absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *Id.* Dismissal is appropriate only where there is "continuing prejudice" which cannot "be remedied

18

by a new trial or suppression of evidence." *Id.* at 365 n. 2. *See also Weatherford v. Bursey*, 429 U.S. 545, 554-58 (1977) (Sixth Amendment not violated when the defendant suffered no prejudice).

In this instance, against the backdrop of changed procedures due to the Covid-19 pandemic, the Sheriff's Office inadvertently recorded video conferences containing privileged attorney-client communications. None of the police officers and none of the prosecutors listened to any of the discussions between counsel and Smith. Privileged attorney-client communications constitute a bedrock of our legal system. We certainly do not condone the recording of such confidential discussions, even when done inadvertently. Here, however, there is no evidence the recordings caused Smith any prejudice. Accordingly, we affirm the decision of the Court of Appeals on this point.

V.      SMITH'S MANDATORY LIFE SENTENCE IS CONSTITUTIONAL.

Virginia law requires a mandatory life sentence when a rape involves a child under the age of 13 and a perpetrator over the age of 18. Code § 18.2-61(B)(2). Relying chiefly on *Graham v. Florida*, 560 U.S. 48, 59 (2010), Smith contends in his final assignment of cross-error that his mandatory sentence of life for the rape of a child under the age of 13 is unconstitutional under the Eighth Amendment of the United States Constitution. We do not agree.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." In evaluating a claim that "a punishment selected by a democratically elected legislature" violates the Eighth Amendment, courts "presume its validity." *Gregg v. Georgia*, 428 U.S. 153, 175 (1976). Courts "may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved." *Id.*

19

Finally, "a heavy burden rests on those who would attack the judgment of the representatives of the people." *Id.*

The Eighth Amendment embodies a "proportionality standard," which forbids a punishment that is grossly disproportionate to the severity of an offense. *Graham*, 560 U.S. at 59-60. There are two paths to review a sentence as cruel and unusual and, therefore, "grossly disproportionate" to the convicted offense. *Id.* at 59-60. First, a court "considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." *Id.* at 59. Under this first approach, "[a] court must begin by comparing the gravity of the offense and the severity of the sentence." *Id.* at 60. It will be a "rare case" in which the "threshold comparison . . . leads to an inference of gross disproportionality." *Id.* (citations omitted). If that inference arises, however, "the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." *Id.* When this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate, the sentence is cruel and unusual." *Id.* (citations omitted).

The United States Supreme Court in *Graham* acknowledged that it can be "difficult for the challenger to establish a lack of proportionality" under this component of the test. *Id.* at 59. We have no difficulty in concluding that the sentence imposed on Smith does not lead to an inference of gross disproportionality. Precedent from the United States Supreme Court points in that direction,[7] as does the heinous nature of the crime and its lasting psychological effects on the victim.

---

[7] *See Harmelin v. Michigan*, 501 U.S. 957, 994-96 (1991) (upholding a sentence of mandatory life in prison without the possibility of parole for a person convicted of possessing a significant quantity of drugs, specifically, 672 grams of cocaine); *Ewing v. California*, 538 U.S.

20

The second approach is to look at "categorical" rules to define Eighth Amendment standards. *Graham*, 560 U.S. at 62. In determining whether a sentence is unconstitutional, "[t]he Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice,' to determine whether there is a national consensus against the sentencing practice at issue." *Id.* (citations omitted). The court must then "determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Id.* In reaching this determination, courts are "guided by 'the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose.'" *Id.* (citations omitted). Courts should consider "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question," and "whether the challenged sentencing practice serves legitimate penological goals," including retribution, deterrence, incapacitation, and rehabilitation. *Id.* at 67, 71-74.

Addressing the first step in the analysis, Smith notes that few States impose a mandatory life sentence for the rape of a young child. While that is true, we do not understand the Eighth Amendment to require uniformity in punishment, nor could such uniformity be expected in a union of sovereign States. We have examined the statutes of our sister States that involve a crime analogous to Code § 18.2-61(B)(2). The most salient fact is that many of our sister States punish the rape of a young child by an older adult with great severity. To give but a few

---

11, 30-31 (2003) (rejecting a challenge to a sentence of 25 years to life for the theft of a few golf clubs under California's "three-strikes" recidivist sentencing statute); *Rummel v. Estelle*, 445 U.S. 263 (1980) (upholding a sentence of life with the possibility of parole for a defendant's third nonviolent felony, the crime of obtaining money by false pretenses); *Hutto v. Davis*, 454 U.S. 370 (1982) (per curiam) (upholding a sentence of 40 years for possession of marijuana with intent to distribute and distribution of marijuana).

21

examples, West Virginia criminalizes sexual contact with someone younger than 12 years of age by someone over 18 years of age. W.Va. Code § 61-8B-3(2). The penalty for violating this statute is a minimum of 25 years in prison and a maximum of 100 years. *Id.* at (c). Wisconsin prohibits sexual contact with an individual under the age of 13. Wis. Stat. § 948.02 (am), (e). If the sexual contact results in substantial bodily harm, then the act is a Class A felony. If there is no substantial bodily harm, then it is a Class B felony. *Id.* Class A felonies carry a penalty of life imprisonment, while Class B felonies carry a penalty of imprisonment up to 60 years. *Id.* at § 939.50(3). Many similar State statutes could be cited.[8] Some other States are, to be sure, comparably more lenient.[9] Nevertheless, the picture that emerges from a comparison of other State statutes is that the rape of a young child by an older adult is punished with severity.

The parties do not cite data concerning actual sentencing practices. *See Graham*, 560 U.S. at 62 (examining actual sentencing practices because they form "an important part of the Court's inquiry into consensus."). With the picture thus incomplete, we are unable to conclude that objective indicia establish a national consensus against a severe punishment for the rape of a young child by an older adult.

Two additional considerations inform our decision. First, the cases from the United States Supreme Court reveal a particular solicitude when interpreting the Eighth Amendment's

---

[8] *See, e.g.*, Ala. Code § 13A-6-61(a)(3) (rape statute) and § 13A-5-6 (permitting punishment up to life in prison); Ariz. Rev. Stat. § 13-1405 (prohibiting sexual contact with minors) and § 13-705(B) (permitting life sentence when child is twelve years of age or younger); N.C. Gen. Stat. § 14-27.23 (defining statutory rape of a child by an adult and providing a maximum punishment of life imprisonment without parole when the victim is under 13 and the perpetrator is over 18).

[9] *See, e.g.*, Haw. Rev. Stat. § 707-730 (defining sexual assault in the first degree) and § 707-659 (providing indeterminate term of 20 years for Class A felonies); S.D. Codified Laws § 22-22-1(1) (defining rape) and § 22-22-1.2 (providing penalty of 15 years for first offense if the victim is under 13).

reach as applied to sentences of death,[10] or life sentences imposed upon juveniles.[11] We are not aware of such solicitude in non-capital cases for *adults* who are convicted of raping *children*.

Second, our review of Smith's sentence is informed by a foundational precept of constitutional law: the specification of punishments is a question "peculiarly . . . of legislative policy." *Gore v. United States*, 357 U.S. 386, 393 (1958). Consequently, "[r]eviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." *Solem v. Helm*, 463 U.S. 277, 290 (1983).

Guided by these principles, we conclude that the life sentence imposed upon Smith does not violate the Eighth Amendment's prohibition on cruel and unusual punishment.

CONCLUSION

The judgment of the Court of Appeals is affirmed in part and reversed in part.

*Reversed in part,*
*affirmed in part,*
*and final judgment.*

---

[10] *See, e.g.*, *Furman v. Georgia*, 408 U.S. 238 (1972) (death penalty cruel and unusual as imposed under those cases); *Kennedy v. Louisiana*, 554 U.S. 407 (2008) (Eighth Amendment forbids imposition of the death penalty for the rape of the child not accompanied by the death of the child).

[11] *See, e.g.*, *Graham*, 560 U.S. at 82 (Eighth Amendment prohibits imposition of a life sentence on a juvenile who committed non-homicide crimes); *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (mandatory life sentence imposed on juvenile who committed a homicide violates the prohibition on cruel and unusual punishment when the jury lacks the opportunity to consider mitigating circumstances and notes that "children are constitutionally different from adults for purposes of sentencing.").